[Cite as *DSWDWK, L.L.C. v. Airgas USA, L.L.C.*, 2026-Ohio-3092.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

DSWDWK, LLC,                           :          APPEAL NO.    C-250580
                                                  TRIAL NO.     A-2301534
    Plaintiff-Appellee,           :

  vs.                                  :

AIRGAS USA, LLC,                       :
                                                  *JUDGMENT ENTRY*
    Defendant-Appellant.          :


This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is reversed and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 8/12/2026.**

**Pursuant to App.R. 30, the clerk is directed to send all parties, or their counsel if represented, a copy of the court's judgment and note such action on the docket.**


**By:**_____
       **Administrative Judge**

[Cite as *DSWDWK, L.L.C. v. Airgas USA, L.L.C.*, 2026-Ohio-3092.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| DSWDWK, LLC, | : | APPEAL NO. | C-250580 |
| | | TRIAL NO. | A-2301534 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| AIRGAS USA, LLC, | : | | |
| | | *O P I N I O N* | |
| Defendant-Appellant. | : | | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: August 12, 2026

*Barron, Peck, Bennie & Schlemmer* and *Steven C. Davis*, for Plaintiff-Appellee,

*FBT Gibbons LLP* and *Ryan W. Goellner*, *Wegman Hessler Valore* and *Jay R. Carson,* for Defendant-Appellant.

**KINSLEY, Presiding Judge.**

{¶1} Defendant-appellant Airgas USA, LLC, ("Airgas") a gas supply company, entered into a contract with plaintiff-appellee DSWDWK, LLC, ("Impact") a commercial beverage bottler, to serve as the exclusive provider of Impact's gas. Impact also contracted with Airgas to rent a large storage tank to hold its monthly gas deliveries. For years, Airgas supplied Impact with the gas it needed to bottle its clients' carbonated beverages without incident. But, in its sixth year, the parties' relationship began to sour. Impact needed more gas than the parties' contract contemplated, and unforeseen events outside of Airgas's control interrupted the supply of available commercial gas. As a result, Impact quit paying Airgas's bill and sourced its gas elsewhere. When attempts to amicably resolve the dispute failed, Airgas padlocked its storage tank and ultimately removed it from Impact's property. Impact claimed the loss of the tank severely limited its ability to fulfill outstanding orders from its largest client, Carbliss.

{¶2} Impact sued Airgas for conversion, trespass to chattels, and tortious interference with its Carbliss contract. In response, Airgas counterclaimed for breach of contract. The trial court denied Airgas's motion for summary judgment and tried all claims to the bench. Following the trial, it ruled in favor of Impact on its three tort claims and against Airgas on its counterclaim.

{¶3} Airgas now appeals, arguing that the trial court should have awarded summary judgment in its favor under the economic loss rule. More specifically, Airgas contends that Impact's tort claims should have been raised as contract claims because they originated from the parties' contractual agreement rather than an independent legal duty. Airgas also argues that the trial court erred in denying its breach of contract claim on the basis of waiver. We agree with Airgas on both fronts. We accordingly

reverse the trial court's judgment and remand the matter for computation of damages.

*Factual and Procedural History*

{¶4}    In July 2016, Impact and Airgas entered into a product sales agreement ("PSA") under which Airgas would supply Impact with gas to carbonate bottled beverages.  The PSA took effect in April of 2017.  Initially lasting for a five-year term, the PSA renewed annually if neither party cancelled six months before its expiration. The parties agreed that the PSA was governed by Delaware rather than Ohio law.

{¶5}    The PSA's initial five-year term concluded in April of 2022 and renewed for another year, as neither party canceled six months earlier.  Under the key terms of the PSA, Impact agreed to exclusively purchase all of its commercial gas from Airgas. In turn, Airgas agreed to supply gas to Impact up to an estimated monthly amount.  If Impact required additional gas beyond the estimated amount, Airgas had the option, but not the obligation, to provide the excess product.[1]  If Airgas failed to meet Impact's demand, the parties agreed that Impact would be limited to recovering the difference in price between a substitute product and the product Airgas should have provided.[2]

{¶6}    A rider attached to and incorporated by the PSA established the estimated monthly volume of Impact's gas as 10,000 to 12,000 pounds.  The rider also provided that Airgas would rent Impact a six-ton storage tank for a monthly rental fee

---

[1] These terms were contained in Section 1 of the PSA, which provided:
> Buyer shall buy from Seller Buyer's present and future requirements of industrial . . . gases . . . ("Products"), in suitable containers, . . . upon the terms and conditions set forth in this Agreement, including, without limitations, any rider or amendment to this Agreement. . . . In the event that Buyer's requirements for any of the Products should exceed the original estimated quantities under this Agreement, Seller shall not be obligated, but shall have the right at its option, to deliver Product that exceeds such original amount. . . .

[2] To this end, Section 15 of the PSA provided:
> Buyer's exclusive remedy for the unexcused failure on the part of Seller to deliver product when required by Buyer, regardless of cause of such failure, including negligence, shall be to recover from Seller the difference between the cost to Buyer of any reasonable purchase of Product in substitution for Product not delivered and the lesser price of such quantity hereunder.

4

of $600. Under Section 8 of the PSA, Impact was required to permit Airgas to access the tank at all times, and Airgas was required to maintain the tank and keep it in good repair. Section 8 also provided that Impact "shall have no ownership interest" in the tank. Under Section 10, Airgas had the right to remove the tank "within ninety (90) days after the expiration or termination" of the PSA.

{¶7}   During the spring of 2022, the relationship between Impact and Airgas began to grow hostile. Impact initially claimed that Airgas undersupplied its gas and that it was due a credit on its bill. Impact therefore withheld payment for Airgas's monthly gas deliveries. When it was not paid, Airgas eventually locked and then repossessed the gas storage tank on Impact's property. Impact alleged this caused severe interruption to its ability to fulfill beverage production orders for its clients.

{¶8}   On April 12, 2023, Impact sued Airgas. Relevant to this appeal are three of Impact's claims. First, Impact alleged that Airgas committed conversion by engaging in "a wrongful act which impacted Impact's dominion and control over the Tanks and resulted in a disposition of Impact's property rights." Second, Impact alleged that Airgas trespassed to its chattels through an "unauthorized and intentional intrusive act which interfered with Impact's right to exclusive possession of the property." Third, Impact alleged that Airgas tortiously interfered with its customer contracts "[b]y intentionally altering and then removing the Tanks used by Impact to store carbonated gas products [and] knowingly, consciously and intentionally interfer[ing] with Impact's ability to perform the aforesaid contract with third parties."

{¶9}   On June 23, 2023, Airgas counterclaimed for breach of contract, alleging that Impact materially breached the PSA's exclusivity clause and breached the PSA by refusing to pay for the gas Airgas had supplied.

{¶10}   The parties initially moved for judgment on the pleadings. Importantly,

5

Airgas's motion raised an issue regarding the applicability of the economic loss rule, which bars a party from pursuing tort claims for economic losses that arise purely from a breach of contract. *See Corporex Dev. & Constr. Mgt. v. Shook, Inc.*, 2005-Ohio-5409, ¶ 6. The trial court concluded that, because the parties' possessory interests were uncertain at that time, "reasonable minds could differ" as to whether the economic loss rule barred Impact's complaint. It accordingly denied the motions.

{¶11} Following discovery, Airgas moved for summary judgment and repeated the argument that Impact's tort claims were barred by the economic loss rule. The trial court again rejected Airgas's position. Instead, the trial court found that three issues of material fact precluded summary judgment: (1) "which party ha[d] a superior interest in the tank and other equipment," (2) "whether Impact was in default," thus allowing Airgas to repossess the tank pursuant to the PSA, and (3) regarding the tortious interference claim specifically, "whether Airgas had a motive to interfere with Impact's business relations."

{¶12} Impact's claims and Airgas's counterclaim were then tried to the bench. The parties jointly submitted the PSA as a trial exhibit. Impact and Airgas each called one witness.

{¶13} Whit Hesser, Impact's chief executive officer ("CEO"), testified regarding Impact's business operations. According to Hesser, Impact operated a canning plant which produced cartons of product for its customers. Impact's largest client was Carbliss, a producer of carbonated alcoholic beverages.

{¶14} Impact executed the PSA before Hesser became its CEO. Hesser understood the PSA to obligate Impact to exclusively purchase its gas from Airgas and to obligate Airgas to provide an estimated amount of 10,000 to 12,000 pounds of gas per month to Impact. According to Hesser, Impact also leased a six-ton tank from

Airgas, which Airgas was required to service.

**{¶15}** During the first four years of the PSA, Hesser believed that Airgas's service operated smoothly. But in the beginning of 2022, the tank began to run out of gas. When this happened, Hesser contacted Chris Alles at Airgas, who explained that the gas shortfall resulted from a labor shortage in the number of available drivers.

**{¶16}** According to Hesser, Impact had to shut down its plant when the tank ran out of gas. These shortages occurred every 30 to 45 days in the early part of 2022, and Impact had to close the plant for up to a day and a half. Hesser told Alles about the shutdowns but never relayed the monetary losses Impact suffered as a result.

**{¶17}** Hesser then drafted a "credit memo," which reflected Impact's losses from the periodic shutdowns. In the credit memo, Hesser claimed a credit towards Impact's future invoices from Airgas to offset its lost revenues from the empty gas tank. Hesser's first draft of the credit memo claimed a $33,750 credit.[3] Airgas never acknowledged receipt of the initial credit memo.

**{¶18}** Hesser testified that, in June 2022, Impact sent a letter to Airgas indicating its intent to cancel the PSA, along with a second credit memo claiming a total of $66,000 in credit against Airgas's invoices. On June 3, 2022, Airgas acknowledged receipt of the cancellation but not the credit. In its acknowledgment, Airgas took the position that the PSA had automatically renewed for one year in April of 2022, since it had not been cancelled six months earlier. Therefore, according to Airgas, the PSA remained in effect until April of 2023.

**{¶19}** According to Hesser, on August 30, 2022, Airgas notified Impact in

---

[3] The credit memo contained an explanation of how the $33,750 credit was calculated. The equation included information on Impact's per case profit margin and the number of cases it can produce per shift.

7

writing of disruptions in the commercial gas market outside of its control that were expected to last through October 2022. Airgas therefore invoked a force majeure clause in the PSA, which allowed Impact to purchase gas from another company rather than relying on Airgas as its exclusive supplier. Hesser testified that, once the force majeure clause took effect, Impact began buying gas from Trade & Industrial ("Trade").

{¶20} Per Hesser's testimony, Impact and Airgas met in late September or early October 2022 to discuss their disputes, which at that point included Impact's credit memos and Airgas's invocation of the force majeure clause. Following the meeting, Airgas presented Impact with a settlement proposal. Airgas proposed that Impact pay $60,546.97 towards its unpaid invoices, upon which Airgas would issue a $10,000 credit. Impact rejected the offer on October 22, 2022.

{¶21} Hesser testified that two days later, on October 24, 2022, Airgas responded that it would repossess its tank and look to settle the dispute differently. Impact indicated that it did not consent to the tank being removed. Instead, Impact notified Airgas that the tank was in need of repair, but, according to Hesser, Airgas refused to fix it.

{¶22} As Hesser explained, Impact continued to purchase gas from Trade through January 2023, because Airgas never provided notice that the force majeure period was revoked. Around that same time, Airgas reminded Impact in writing of its obligation to exclusively purchase its gas from Airgas. Although the letter referenced the PSA's exclusivity clause, Hesser did not interpret the communication as a rescission of the force majeure clause.

{¶23} Hesser testified that Airgas disabled its tank on February 3, 2023, by installing a lock. At the time, Impact was using smaller tanks supplied by Trade to

8

store its gas, so the disruption did not shut down Impact's business. Eventually Impact ordered a 26-ton horizontal tank from Trade, much larger than the six-ton tank it had leased from Airgas.

**{¶24}** In early March 2023, Airgas removed its tank from Impact's property. Hesser testified that Impact was not using the tank, so the repossession did not materially change Impact's operations. The plant was, however, negatively impacted by Impact's shift to smaller tanks, which happened before Airgas padlocked its tank. As a result, Impact was unable to fulfill its contract with Carbliss as quickly as expected.

**{¶25}** Hesser testified that, in March 2023, Carbliss decreased the number of cases in its order, resulting in a loss of about $1.9 million in revenue to Impact. On cross-examination, Hesser conceded that Impact entered into its contract with Carbliss the same day that Airgas indicated it intended to repossess the tank.

**{¶26}** Hesser believed that Section 1 of the PSA required Airgas to supply an unlimited amount of gas to Impact. Although the rider incorporated into the PSA set the estimated monthly amount at 10,000 to 12,000 pounds, Hesser noted this was only an estimate. Hesser acknowledged that, in April 2022, when the tank ran empty, Impact had ordered 33,400 pounds of gas, which was almost triple the estimated monthly amount. Hesser also acknowledged that the tank would not have been on Impact's property if not for the PSA.

**{¶27}** Hesser further admitted that Impact did not pay any of Airgas's invoices after April 22, 2022, nor did Impact pay the rental fee for the tank. Hesser agreed, however, that, despite the lack of payment, in May 2022, Airgas supplied Impact with 29,000 pounds of gas, and in June 2022, Airgas supplied Impact with 37,000 pounds of gas. Hesser further acknowledged that Airgas provided 30,000 pounds of gas in

September 2022 and 24,000 pounds in October 2022, both months during the force majeure period.

{¶28} Hesser testified that after October 2022, Impact no longer ordered gas from Airgas but exclusively purchased gas from Trade. Even though this violated the PSA's exclusivity clause, Hesser believed that the PSA allowed Impact to instruct Airgas not to remove its tank from Impact's property. Hesser acknowledged, however, that the PSA did not permit Impact to deduct its lost profits as a credit from the cost of the gas.

{¶29} After Hesser testified, Impact rested.

{¶30} Airgas's sole witness was Chris Alles, Airgas's Cincinnati district manager. Alles testified that, in April 2022, he met with Jared Hamilton, an operations official with Impact, at Impact's facility to discuss the alleged gas shortage. During the meeting, Alles suggested that Impact increase the size of its tank from six tons to 14, as Impact's average gas usage had increased from the estimated 10,000 to 12,000 pounds to the upper 30,000s to low 40,000s pounds per month. According to Alles, he provided Hamilton with information about a 14-ton tank, but Impact never followed up.

{¶31} Alles also described the circumstances under which Airgas invoked the PSA's force majeure clause. According to Alles, a feedstock production issue in Michigan temporarily disrupted Airgas's gas supply. Despite Airgas's invocation of the force majeure provision, Airgas continued to supply Impact with 29,000 pounds of gas each month.

{¶32} Alles testified that he received an invoice from Impact requesting that Airgas pay the amount reflected in the credit memo. Alles declined this request because he did not believe that Airgas owed Impact a credit. Impact then quit paying

its gas bills.  According to Alles, Airgas did not provide Impact with any product after October 2022 once Impact stopped paying.

**{¶33}**  Alles agreed that the parties attempted to settle their disputes amicably. At that time, according to Alles, Impact owed $60,546.97 in past-due fees for gas.  As part of the proposed settlement, Airgas offered Impact a $10,000 credit as goodwill. Airgas also proposed terminating the PSA.  But it agreed that Impact could continue to use its tank for 60 days to allow Impact to locate another supplier.

**{¶34}**  Alles testified that when negotiations broke down, and Impact still owed the outstanding invoices, Airgas padlocked its tank.  Shortly before this happened, Alles spoke with Hesser to inform him that Airgas needed the tank for another customer.  According to Alles, Airgas also notified Impact of its intent to remove the tank because Impact had not paid an invoice in eight months.  Although Airgas indicated it would remove the tank in ten days, the tank was not actually removed until a couple of months later.

**{¶35}**  Alles further testified about his communication with Hesser leading up to the removal of the tank.  Hesser told Alles that Impact still needed the tank but did not confirm that Impact wanted to do business with Airgas. Instead, Hesser informed Alles that Impact was still purchasing its gas from Trade, even though the force majeure period had concluded.  Alles later learned in February that Impact was also using another company's tank.

**{¶36}**  Alles disclaimed knowledge that locking the tank would cause Impact's operations to come to a halt.  Rather, Alles knew that Impact had on-site dewars—or insulated cylinders—that were available as alternate storage mechanisms.

**{¶37}**  Airgas rested after Alles testified.

**{¶38}**  Nearly three months after the trial, the trial court issued its verdict in

written findings of facts and conclusions of law. As to Airgas's argument that the economic loss rule barred Impact's tort claims, the trial court concluded that Airgas had an independent duty, derived from common law, not to damage, transfer, or interfere with Impact's superior property right in the tank. Given these duties, which existed outside of the parties' contract, the trial court concluded that the economic loss rule did not bar Impact's tort claims. Regarding Impact's conversion and trespass to chattels claims, the trial court found that, during the term of the PSA, Impact had a superior right to the tank. The trial court therefore concluded that Airgas converted Impact's property and trespassed as to its chattels by first disabling and then removing the tank. Regarding Impact's tortious interference claim, the trial court determined that Airgas knew that failing to supply gas would cause Impact to suffer economic loss. It therefore found Airgas liable for Impact's losses due to its Carbliss contract. As to Airgas's counterclaim for breach of contract, the trial court concluded that both parties breached the PSA—Airgas by undersupplying the tank in early 2022 and by failing to repair it, and Impact by failing to pay Airgas and by obtaining gas from Trade. But it concluded that Airgas waived Impact's breaches by continuing to perform under the PSA.

{¶39} The trial court accordingly issued judgment in favor of Impact on its three claims and on Airgas's counterclaim. It awarded Impact $1,932,768 in damages for its losses on the Carbliss contract and $262,817 in damages for the disruption to Impact's production when the tank was locked.

{¶40} Airgas has appealed.

### *Analysis*

{¶41} On appeal, Airgas raises two assignments of error. First, Airgas argues that the trial court erred in denying its motion for summary judgment and in entering

12

judgment in Impact's favor on its claims for conversion, trespass to chattels, and tortious interference. Second, Airgas argues that the trial court erred in entering judgment in Impact's favor on Airgas's counterclaim. Both assignments of error are meritorious.

### A. Summary Judgment

{¶42} We begin with Airgas's argument that the trial court should have granted summary judgment in its favor, as it is dispositive of Airgas's first assignment of error.

{¶43} Summary judgment is proper under Civ.R. 56(C) where "(1) no genuine issue of material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." Civ.R. 56(C); *Al Neyer, LLC v. Westfield Ins. Co.*, 2020-Ohio-5417, ¶ 14 (1st Dist.). The moving party has the initial burden of demonstrating its entitlement to summary judgment. *Al Neyer* at ¶ 15. "A moving party meets its initial burden by informing the trial court of the basis for the motion and identifying the portions of the record that demonstrate that there is an absence of evidence to support the nonmoving party's case." *B&T Business Ventures v. Disi Bros. Land, LLC*, 2022-Ohio-2113, ¶ 12 (1st Dist.).

{¶44} Once the moving party has supported its summary judgment motion with proper evidence, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings." Civ.R. 56(E). Instead, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* If the nonmoving party fails to respond or to support its response with appropriate summary

judgment evidence, the trial court may grant summary judgment. *McCoy v. Usuani*, 2009-Ohio-3095, ¶ 10 (1st Dist.), citing Civ.R. 56.

{¶45} An appellate court generally reviews a trial court's ruling on a motion for summary judgment de novo. *Travelers Prop. Cas. Corp. v. Chiquita Brands Internatl., Inc.*, 2024-Ohio-1775, ¶ 17 (1st Dist.). This standard applies even if the unsuccessful movant ultimately loses at trial. *See Balson v. Dodds*, 62 Ohio St.2d 287 (1980), paragraph one of the syllabus. Although errors in the denial of a summary judgment motion that are factual in nature will often be rendered moot when the trial proceedings show that a genuine issue of material fact supported denying the motion, the denial of a summary judgment motion is not harmless when the denial was predicated on a pure question of law. *Bliss v. Manville*, 2022-Ohio-4366, ¶ 14.

### 1. The Economic Loss Rule

{¶46} Airgas contends that the trial court erred in failing to apply the economic loss rule to Impact's tort claims. We agree.

{¶47} As explained by the Ohio Supreme Court, the economic loss rule prevents "the tortification of contract law." *Motorists Mut. Ins. Co. v. Ironics, Inc.*, 2022-Ohio-841, ¶ 28. "Under the economic loss doctrine, a party cannot recover purely economic damages in a tort action against another party based upon the breach of contractually created duties." (Cleaned up.) *KSMAC Holdings, Ltd. v. Ice Zone Realty, Ltd,* 2022-Ohio-1456, ¶ 55 (7th Dist.). In other words, a breach of contract claim cannot create a tort claim. *Plus Mgt. Servs. v. Liberty Healthcare Corp.*, 2024-Ohio-3127, ¶ 26 (2d Dist.). Thus, a plaintiff cannot sue for a tort claim that is based on the same underlying conduct as a contractual claim "unless the defendant also breached a duty that was owed independently of the contractual duties." *KSMAC* at ¶ 56.

**{¶48}** Some courts, including this court, have suggested that the economic loss rule generally does not apply to intentional torts. *See, e.g., Momentum Freight Logistics Corp. v. Benie Logistics, Inc.*, 2025-Ohio-5738, ¶ 68 (10th Dist.); *Eysoldt v. Proscan Imaging*, 2011-Ohio-2359, ¶ 21 (1st Dist.). This is so because "intentional torts necessarily involve duties beyond those created by contract." *Momentum Freight Logistics Corp.* at ¶ 68.

**{¶49}** Yet, despite this authority, courts have routinely held that intentional tort claims can be barred by the existence of a contract. For example, in *Plus Mgt. Servs.* at ¶ 26, the court noted that "even in cases involving intentional torts, a mere breach of contract does not create a tort claim." Rather, for an intentional tort claim and a contract claim to coexist, the breaching party must owe a duty even in the absence of the parties' contractual relationship, and the intentional tort must involve damages that are separate and distinct from the breach of contract. *Id.* at ¶ 26-27.

**{¶50}** This court follows a similar analysis. Recently, in *Vandemark v. Reder*, 2026-Ohio-50, ¶ 43-44 (1st Dist.), we held that two criteria govern the inquiry into whether an intentional tort claim can stand alone in light of the parties' contractual relationship: "(1) whether the defendant owed a legal duty to the plaintiff, [and] (2) whether that duty was created or governed by the terms of a valid contract." *Id.* at ¶ 44.

**{¶51}** The general principle that the economic loss rule does not apply to intentional torts therefore appears to be just that—a generalization. Courts are not precluded from analyzing whether the defendant owed the plaintiff an independent duty, separate from the parties' contractual relationship, for the purpose of determining the applicability of the economic loss rule merely because the plaintiff sues for an intentional tort. Rather, as we held in *Vandemark*, when the plaintiff raises

a claim for an intentional tort, and the defendant asserts that the claim is barred by the economic loss rule, the appropriate analysis is to determine the source of the defendant's duty. *Vandemark* at ¶ 43-44. We conduct that analysis now.

## 2. *Conversion and Trespass to Chattels*

{¶52} Impact sued Airgas for conversion and trespass to chattels. Conversion and trespass to chattels require proof of ownership or a possessory interest in the affected property. *See Bruns v. Adlard*, 2025-Ohio-5202, ¶ 20 (1st Dist.) (conversion); *Mathews v. Cooper*, 2021-Ohio-2768, ¶ 45 (8th Dist.) (trespass to chattels). Impact claims it was entitled to possess and use the gas storage tank because it rented the tank from Airgas as a term of the PSA.

{¶53} Because Impact's claim to possession derives from the PSA, there is no other way to view these claims but as contractual. Focusing on the first prong of the *Vandemark* test, Airgas had no duty to provide a gas storage tank to Impact other than the one it contractually agreed to in the PSA. And Impact had no right to possess the gas storage tank outside of the one it bargained and paid for by virtue of its contract with Airgas.

{¶54} Turning to the second prong of *Vandemark*, the parties' relationship with regard to the tank was entirely governed by the PSA. The rider, which was incorporated into the PSA, outlined that Impact would rent a six-ton tank from Airgas for a rental fee of $600 per month. Section 8 of the PSA required Impact to make the tank available to Airgas at all times for servicing. Section 10 provided that Airgas could repossess the tank within 90 days of the agreement's termination. Section 8 also disclaimed any ownership interest in the tank on Impact's part. The specificity of these provisions demonstrates that the parties reached a negotiated agreement as to what their respective duties regarding the tank would be.

16

**{¶55}** Given the lack of an independent duty outside the PSA, Impact's conversion and trespass to chattels claims are therefore contract claims barred by the economic loss rule.

**{¶56}** This conclusion is fully consistent with three recent decisions from other Ohio courts. First, in *Plus Mgt. Servs.*, 2024-Ohio-3127, at ¶ 30 (2d Dist.), the Second District barred a plaintiff from suing for conversion for conduct that essentially amounted to a breach of contract. At issue in *Plus Mgt. Servs.* was a dispute between the seller and purchaser of a nursing home over capital expenditures and management fees. *Id.* at ¶ 4-8. A jury found in favor of the seller on its conversion claim, awarding it over $800,000 in damages. *Id.* at ¶ 11. On appeal, the buyer argued that the seller's claim for conversion was barred by the economic loss rule. *Id.* at ¶ 23. Rejecting the seller's argument that its conversion claim rested on the independent duty not to commit an intentional tort, the Second District agreed. *Id.* at ¶ 28. If such a duty existed, the court reasoned, the distinction between tort and contract claims would be meaningless, as a general duty to refrain from intentional torts exists in every case. *Id.* Rather, the court focused on the source of the buyer's duty. Because the buyer's obligation to limit capital expenditures was "grounded in the parties' contracts," and because "[r]esolution of this issue turned on the parties' contractual duties," the court set aside the jury's conversion verdict. *Id.* at ¶ 29-30.

**{¶57}** The Seventh District reached a similar outcome in *KSMAC Holdings,* 2022-Ohio-1456 (7th Dist.). There, KSMAC entered into a five-year lease agreement with Ice Realty to rent space for a trampoline park. *Id.* at ¶ 2. The contract contained a purchase option, which KSMAC eventually exercised. *Id.* at ¶ 2-3. The parties negotiated and entered into an agreement for the sale of the property, including sports equipment and fixtures, under which KSMAC agreed to assume Ice Realty's other

obligations, including an elevator service contract and existing skating contracts. *Id.* at ¶ 3-4. After the contract was signed, but prior to closing, Ice Realty removed all of its personal items from the building. *Id.* at ¶ 5. Then, after closing, KSMAC noticed that the ice floor in the building was melting due to a lack of refrigerant. *Id.* at ¶ 6. KSMAC demanded that Ice Realty return the refrigerant so it could refreeze the floor, but Ice Realty refused, arguing that it constituted personal property not intended for sale. *Id.*

**{¶58}** KSMAC sued Ice Realty for breach of contract, promissory estoppel, unjust enrichment, civil theft, conversion, fraud, and negligent misrepresentation, and sought to pierce the corporate veil. *Id.* at ¶ 7. Ice Realty moved for summary judgment on the civil theft, conversion, and fraud claims, arguing that they were barred by the economic loss rule. *Id.* at ¶ 8. KSMAC opposed the motion on the ground that removal of the refrigerant physically damaged the facility, causing economic loss outside of the parties' contract. *Id.* at ¶ 9. KSMAC also filed its own summary judgment motion, arguing that refrigerant was included in the term "chilling equipment" and was therefore required to be sold under the parties' contract. *Id.* The trial court agreed with Ice Realty. *Id.*

**{¶59}** On appeal, KSMAC challenged the trial court's application of the economic loss rule to its conversion claim. *Id.* at ¶ 59. But the Seventh District agreed with the trial court that KSMAC's conversion claim had no independent source of duty outside of the parties' contract. *Id.* at ¶ 56. It accordingly affirmed the trial court's decision to award summary judgment to Ice Realty. *Id.* at ¶ 59.

**{¶60}** Most recently, the Third District barred a conversion claim under the economic loss rule in *Rena Lyon Revocable Trust v. Berry*, 2026-Ohio-2369, ¶ 35 (3d Dist.). Because the plaintiff's claim as to the storage and disposition of her personal

property arose from a residential purchase agreement, the court held that it was "functionally indistinguishable" from her breach of contract claim. *Id*. at ¶ 33.

{¶61} As *Plus Mgt. Servs.*, *KSMAC*, and *Rena Lyon* make clear, the existence of a contract governing the parties' disposition of property forecloses a party's conversion claim regarding that property when it relies on no independent duty outside the contract. That is the case with regard to Impact's conversion claim here. It is also the case with regard to Impact's trespass to chattels claim, which is essentially redundant to its conversion claim. As in *Plus Mgt. Servs.*, the trial court erred in identifying the generalized duty not to commit an intentional tort as the source of Airgas's independent duty. Such a duty always exists and is insufficient to support a separate tort claim when a party is obligated by a more specific contractual responsibility.

{¶62} Before concluding, we address one final point raised by Impact. Impact suggests that the absence of breach of contract claims in its complaint has bearing on our analysis. It argues that we cannot apply the economic loss rule to bar its tort claims when it has no breach of contract claims to fall back on. We reject this contention. If a party could avoid the application of the economic loss rule merely by failing to plead breach of contract claims, we would be inviting gamesmanship in pleading. *See, e.g., State ex rel. Hignight v. Knepp*, 2024-Ohio-1708, ¶ 20 (interpreting legal principles to disfavor "cynical gamesmanship"). Moreover, there is nothing to prohibit a party from pleading alternative contract and tort claims, provided that the facts and the law support doing so. *See Rena Lyon* at ¶ 29.

{¶63} Impact's conversion and trespass to chattels claims rely on no duty outside of Airgas's contractual one. They are accordingly barred by the economic loss rule. The trial court therefore erred in denying Airgas's motion for summary judgment

on these claims.

### 3. *Tortious Interference with Contract*

**{¶64}**  Airgas next argues that the trial court erred in denying its motion for summary judgment on Impact's tortious interference claim.

**{¶65}**  "A party is liable for tortious interference with contract if the party intentionally and improperly interferes with the performance of a contract between another and a third person by inducing the third person not to perform the contract, thus causing damage." *Innovative Architectural Planners, Inc. v. Ohio Dept. of Adm. Servs.*, 2024-Ohio-824, ¶ 21 (10th Dist.).  To establish a tortious interference with contract claim, one must show "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Columbia Dev. Corp. v. Krohn*, 2014-Ohio-5607, ¶ 18 (1st Dist.).

**{¶66}**  To meet these elements, Impact argued that Airgas intentionally and knowingly interfered with its Carbliss contract by locking and then repossessing the gas storage tank, which resulted in slowdowns to Impact's production line, reductions in Carbliss's beverage orders, and ultimately lost profits to Impact.  As with Impact's conversion and trespass to chattels claims, Impact contended that Airgas owed a duty under the PSA to leave the tank in place through the term of the PSA.

**{¶67}**  But like Impact's conversion and trespass to chattels claims, this claim relies on no independent duty outside of the parties' contract.  Even if we agree under the first *Vandemark* factor that Airgas owed Impact a duty under the PSA, the source of any duty Airgas may have owed Impact with regard to the tank originated entirely from the contract.  In other words, the intentional interference with a contract that Impact alleges Airgas caused amounted to nothing more than Airgas's alleged breach

of the parties' tank rental agreement. This claim therefore draws its source entirely from the PSA.

**{¶68}** In arguing otherwise, Impact suggests that the economic loss it suffered—lost profits from its Carbliss contract—fell outside the damages it could recoup under the PSA. This is true. Section 15 of the PSA limits Impact to cover damages and not lost profits in the event Airgas breaches its contractual obligations. But the fact that tort law might provide more generous recovery than the parties' bargained-for agreement is not a basis for excusing the application of the economic loss rule. *See Motorists Mut. Ins. Co. v. Ironics, Inc.*, 2022-Ohio-841, ¶ 28. Had Impact wanted to recover lost profits for a breach of contract, its remedy was to negotiate for such a term in its contract, not to sue for an intentional tort premised on Airgas's breach.

**{¶69}** Airgas's first assignment of error is sustained. The trial court erred in denying Airgas's summary judgment motion on the basis of the economic loss rule. We accordingly reverse the trial court's judgment in Impact's favor as to its claims for conversion, trespass to chattels, and tortious interference.

### B. Breach of Contract

**{¶70}** In its second assignment of error, Airgas challenges the trial court's verdict on its breach of contract counterclaim. In resolving the counterclaim in Impact's favor, the trial court concluded that Impact breached the PSA by failing to pay for the gas Airgas delivered and by sourcing its gas from Trade despite its exclusivity agreement with Airgas. But it concluded that Airgas waived these breaches and thereby forfeited its ability to sue by continuing to perform its obligations under the parties' agreement.

**{¶71}** We review a trial court's judgment following a bench trial in a civil case

under a blended standard of review. Under that standard, a trial court's findings of fact are entitled to a presumption of correctness, particularly given that the trial court had the opportunity to observe the witnesses and assess their credibility. *Toelke v. Williams*, 2025-Ohio-5032, ¶ 11 (1st Dist.). However, we review a trial court's determination of questions of law de novo. *McIntyre v. Landscape Mgt. & Design*, 2026-Ohio-1560, ¶ 14 (8th Dist.).

**{¶72}** In resolving Airgas's breach of contract counterclaim, the trial court made a number of factual findings regarding Airgas's performance under the PSA. As no party has challenged these findings, we presume they are correct. After Impact stopped paying its invoices, Airgas communicated its intent to continue supplying gas as part of its settlement negotiations. In those conversations, Airgas repeatedly acknowledged that the PSA was in effect through April 2023, as neither party had terminated it six months before it renewed in 2022. Airgas also reminded Impact of its obligation to exclusively purchase gas from it and demanded that Impact stop doing business with Trade as required by the PSA.

**{¶73}** The legal question we must answer is whether these actions waived Impact's breaches or whether Airgas was still entitled to collect its damages despite continuing to perform under the PSA. If this question is governed by the PSA itself, it must be resolved under Delaware law, as the PSA contains a choice-of-law clause designating Delaware as the controlling state in the event there is a dispute about the meaning or application of the PSA. *See Schulke Radio Prods., Ltd. v. Midwestern Broadcasting Co.*, 6 Ohio St.3d 436 (1983), syllabus (holding that choice-of-law provisions in contracts are generally enforceable). But if the question is one of procedure rather than substantive law, Ohio law dictates the answer. *See Petroff v. HDV Cleveland LLC*, 2025-Ohio-4672, ¶ 12 (8th Dist.).

**{¶74}** We need not determine whether waiver is a procedural or substantive question, or whether Delaware or Ohio law controls the inquiry, as both states approach the topic of waiver in a substantially similar way. Under the laws of both states, a nonbreaching party may still recover damages for a breach of contract despite continuing to perform. *See, e.g., AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 Del. Ch. LEXIS 353, *270 (Del. Ch. Nov. 30, 2020); *Meyer v. Chieffo*, 2011-Ohio-1670, ¶ 32 (10th Dist.). This has been described as an "elementary rule of contracts." *Meyer* at ¶ 32, citing *Bryan Pub. Co. v. Kuser*, 2008-Ohio-2610, ¶ 18 (3d Dist.); *see Jack Turturici Family Trust v. Carey*, 2012-Ohio-6191, ¶ 50 (2d Dist.). When confronted with a breach of contract, a nonbreaching party has two options. *Macrophage Therapeutics, Inc. v. Goldberg*, 2021 Del. Ch. LEXIS 127 (Del. Ch. June 23, 2021). It can either terminate the contract and sue for total breach, or it can continue the contract and sue for partial breach. *Id.* Choosing the latter option does not waive the nonbreaching party's right to obtain damages for the partial breach. *AB Stable* at *270. But it does waive the nonbreaching party's ability to argue that the breach discharged its obligation to perform. *Id.* In other words, the nonbreaching party can "keep the contract alive for the benefit of both parties, being at all times . . . ready and able to perform," and still sue to recover damages under the contract. *Burke & Assoc. v. Koinonia Homes*, 135 Ohio App.3d 683, 687 (8th Dist. 1999).

**{¶75}** Given these principles, the trial court was incorrect as a matter of law in determining that Airgas waived Impact's breaches by continuing to perform under the PSA. Nothing prohibited Airgas from seeking to recoup its unpaid invoices while continuing to provide Impact with gas. Holding otherwise would amount to a determination that Impact was entitled to free gas simply because Airgas continued to meet its monthly demand once Impact stopped paying. But this is not what the parties

agreed to. At most, the parties agreed in Section 15 of the PSA that Impact was entitled to cover damages—e.g., the difference in price between replacement gas and the gas Airgas should have supplied—in the event of a shortage.

**{¶76}** We accordingly sustain Airgas's second assignment of error and reverse the judgment of the trial court in Impact's favor on Airgas's counterclaim, as Airgas did not waive Impact's breaches as a matter of law. Neither party has challenged the trial court's determination that Impact breached the PSA by failing to pay Airgas's invoices and by violating the PSA's exclusivity clause. We accordingly remand the cause to the trial court to enter judgment in Airgas's favor on the breach of contract counterclaim and to determine the amount of damages to which Airgas is entitled.

### *Conclusion*

**{¶77}** Impact's claims for conversion, trespass to chattels, and tortious interference were barred by the economic loss rule, as they relied on no independent duty outside of the parties' contract. The trial court therefore erred in failing to apply the economic loss rule and should have awarded summary judgment in Airgas's favor. Similarly, Airgas prevailed on its counterclaim for breach of contract, which it did not waive by continuing to perform under the contract. We accordingly sustain Airgas's assignments of error, reverse the judgment of the trial court, and remand the cause for a determination of damages on Airgas's counterclaim.

Judgment reversed and cause remanded.

**CROUSE** and **BOCK, JJ.,** concur.